**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 11-21251-CIV-ALTONAGA/Simonton**

**GABY KAFIE**,

      Plaintiff,

vs.

**NORTHWESTERN MUTUAL LIFE**
**INSURANCE COMPANY**,

      Defendant.

_____/

**ORDER**

**THIS CAUSE** comes before the Court on Defendant, Northwestern Mutual Life Insurance

Company's ("Northwestern['s]" or the "Company['s]") Motion to Dismiss and to Strike Portions

of Plaintiff, Gaby Kafie's ("Kafie['s]") Amended Bad Faith Complaint (the "Second Motion") [ECF

No. 27], filed on August 11, 2011. Kafie filed a Complaint on April 8, 2011, containing two

statutory bad-faith claims based on alleged violations of Florida Statute section 624.155 ("section

624.155"). (*See* Compl. [ECF No. 1]). Northwestern filed a motion to dismiss on May 26, 2011 for

failure to state a claim ("First Motion") [ECF No. 10]. On July 18, 2011, the Court granted the First

Motion, concluding the Complaint did not contain sufficient factual matter to satisfy Federal Rules

of Civil Procedure 12(b)(6) and 9(b) with respect to any statutory violation identified. (*See* July 18,

2011 Order [ECF No. 23]). The Court dismissed the Complaint without prejudice and granted Kafie

leave to amend. (*See id.*)

      Kafie filed his Amended Complaint on July 27, 2011. (*See* Am. Compl. [ECF No. 24]).

Kafie now makes one statutory bad-faith claim based on alleged violations of section 624.155. (*See*

Case No. 11-21251-CIV-ALTONAGA/Simonton

Am. Compl. ¶ 54).  The Second Motion challenges the Amended Complaint for failure to state a claim.  The Court has carefully considered the parties' submissions and the applicable law.

## I.  BACKGROUND[1]

### A.     The Initial Contract Dispute Resolved At Trial

In November 2006, Northwestern issued Kafie a disability-income insurance policy (the "Disability Policy") (*see* Am. Compl. Ex. A [ECF No. 24-1]), Policy No. Dl 657 238.  (*See* Am. Compl. ¶ 7).  The Disability Policy provided that Northwestern would pay Kafie a monthly benefit if he became totally or partially disabled from performing his regular duties as a podiatrist.  (*See id*. ¶ 8).  In December 2008, Northwestern issued and delivered to Kafie a whole-life insurance policy (the "Life Policy") (*see* Am. Compl. Ex. B [ECF No. 24-2]), Policy No. 18 440 173, with a face value of $2,000,000.  (*See* Am. Compl. ¶ 9).[2]  The Life Policy provided that its premiums would be waived during any period when Kafie was totally disabled from working as a podiatrist.  (*See id*. ¶ 10).

Around mid-November 2007, Kafie began to experience vision impairment from a condition eventually diagnosed as central serous chorioretinopathy.  (*See id*. ¶ 11).  Due to his vision loss, Kafie became unable to practice podiatry.  (*See id*. ¶ 12).  Kafie then filed a claim for benefits with Northwestern, which approved the claim, finding him disabled from his occupation as of January 4, 2008.  (*See id*. ¶ 13).  Northwestern paid benefits pursuant to the terms of the Disability Policy

---

[1]  The factual background is taken from the allegations in the Amended Complaint, which are accepted as true for the purposes of the Second Motion.

[2]  The Disability Policy and Life Policy are collectively referred to as the "Policies."

Case No. 11-21251-CIV-ALTONAGA/Simonton

until February 3, 2009, when the Company informed Kafie it was terminating his claim.  (*See id*. ¶ 14).

In the termination letter, Northwestern stated it would not continue paying benefits, asserting Kafie was lying about his condition and had never been disabled in the first place.  (*See id*.). Northwestern demanded Kafie repay $34,368.72 of benefits he had already received and pay $912.90 in additional premiums to keep the Disability Policy in force.  (*See id*. ¶ 15).  The letter also demanded Kafie pay a $35,127.28 premium on the Life Policy, and Kafie received a bill for that amount on February 4, 2009.  (*See id*. ¶ 16).  The bill stated it was due on December 12, 2008 and required payment within a 31-day grace period that had already expired by the time Kafie received the bill.  (*See id*.).  According to Kafie, Northwestern's conduct during this period was unmistakably hostile and rude.  (*See id*.).

Kafie contends Northwestern mishandled his claim.  For example, Northwestern's "field consultant," Neil Kern, came to Kafie's home, interviewed him, and allegedly "injected nefarious and inaccurate interpretations of his personal observations of Kafie's conduct" into Kern's report. (*Id*. ¶ 17).  Furthermore, Northwestern ignored the advice of its own physician reviewer, Dr. Zimmermann, and did not speak with Kafie's treating physicians during its claim investigation.  (*See id*. ¶¶ 18–19).  Northwestern retained a physician consultant, Dr. Marilyn Kay, who did not specialize in retinal disease and admitted she did not have experience treating Kafie's condition. (*See id*. ¶ 20).  Dr. Kay said she would usually refer a case like Kafie's to a retinal specialist.  (*See id*.).  Northwestern did not furnish Dr. Kay with complete and legible copies of Kafie's medical records.  (*See id*. ¶ 21).  Nor did Northwestern ever obtain an independent medical examination of

3

Case No. 11-21251-CIV-ALTONAGA/Simonton

Kafie.  (*See id*. ¶ 22).  Moreover, Northwestern's surveillance of Kafie was not related to his ability to perform his occupation.  (*See id*. ¶ 23).  Northwestern failed to establish any connection between the results of its surveillance of Kafie and its conclusion that Kafie could perform the duties of his occupation.  (*See id*. ¶ 24).

Northwestern's decision to terminate Kafie's benefits and seek reimbursement of benefits already paid came without warning to Kafie that his claim was being reevaluated.  (*See id*. ¶ 26).  After having his benefits reevaluated and revoked, Kafie was left without any income to support his family.  (*See id*. ¶ 27).  Kafie could not afford his mortgage payments, lost his home, and had his vehicle repossessed.  (*See id*.).[3]

Faced with Northwestern's adverse decision and claim for reimbursement of benefits and premiums, Kafie hired counsel and filed a breach of contract lawsuit against Northwestern in the Southern District of Florida.  (*See id*. ¶ 17; *see also Kafie v. Northwestern Mut. Life Ins. Co.*, Case No. 09-20948-Civ-Ungaro).  Northwestern counterclaimed for breach of contract and money-had-and-received and sought repayment of the benefits Kafie had already been paid.  (*See* Am. Compl. ¶ 29).

During that litigation, Northwestern maintained Kafie was fabricating or exaggerating his vision loss to obtain disability benefits under the Disability Policy.  (*See id*. ¶ 30).  At a bench trial, Northwestern argued Kafie could walk without assistance and without using supports or aids, that he had no active disease requiring treatment, that there was no impairment to his vision, and that no

---

[3] Kafie has agreed  to remove the allegation of emotional distress from the Amended Complaint. (*See* Reply 17 n.7 [ECF No. 40]).

Case No. 11-21251-CIV-ALTONAGA/Simonton

reason existed for any restriction on his occupational duties. (*See id*. ¶ 32). Northwestern also asserted Kafie fabricated his vision loss because he was worried about losing his medical license due to a criminal charge for Medicaid fraud; Northwestern relied on this criminal charge to explain why Kafie would close his successful practice and claim disability. (*See id*. ¶ 33).

The court concluded any evidence that Kafie may have exaggerated his condition was outweighed by the medical evidence objectively confirming his disability. (*See id*. ¶ 35). The court also agreed with the testimony of Kafie's treating physicians establishing that Kafie's retinal scarring was permanent and that his vision may worsen over time. (*See id*. ¶ 36). The court entered judgment in Kafie's favor on all counts, finding he was totally disabled and entitled to benefits under the Disability Policy and the premium waiver under the Life Policy. (*See id*. ¶ 37). After the decision, Northwestern asked the court to amend its Findings of Fact and Conclusions of Law, but the motion was denied. (*See id*. ¶ 40). Northwestern did not appeal the court's decision. (*See id*. ¶ 38).

**B.     Disagreements Between the Parties Post-Trial**

After the case, additional disagreements have arisen between Kafie and Northwestern. Northwestern has required that Kafie and his attending physician submit continuance of disability benefits forms on an ongoing basis so Northwestern may evaluate Kafie's continuing eligibility for benefits. (*See id*. ¶ 39).

Kafie has interpreted Northwestern's conduct as indicating an intent to continue questioning his disability despite the court's ruling. (*See id*. ¶ 41). Worried his benefits may again be terminated, Kafie requested a buyout offer on his Policies. (*See id*.). Disagreements surfaced about the value of the Policies. Initially, Northwestern suggested a range for the lump-sum present value

5

of Kafie's future benefits, but, according to Kafie, this range significantly undervalued the Policies. (*See id*. ¶ 42). After these initial discussions, Northwestern refused to continue negotiations or to formally offer to buy out Kafie's Disability and Life Policies, maintaining Kafie's evaluation of the buyout value was unrealistic, and advised he consult an actuary. (*See id*.). Conversely, Kafie contended Northwestern improperly used claim termination rates and discounted the value of the Life Policy into a stream of future premiums; such information was communicated to Kafie via letters dated April 20, 2010, June 1, 2010, and June 9, 2010. (*See id*. ¶¶ 42–43).

Kafie contends "the Company's conduct in failing to properly investigate and unreasonably terminating [his] claim, contending he is a fraud, and continuing to question his claim following the Court's ruling, has irrevocably strained the Company's relationship with [him] and constitutes bad faith conduct that [he] should not be required to further endure." (*Id*. ¶ 44). Kafie asks the Court to find that Northwestern has engaged in bad-faith claims practices and to award him the lump-sum present value of future benefits under both the Disability and Life Policies as compensatory damages. (*See id*.).

Kafie filed a Civil Remedy Notice of Insurer Violation ("CRN") pursuant to Florida Statute section 624.155(3), before filing the prior breach-of-contract action, which was accepted by the Florida Department of Financial Services on March 14, 2009 (the "First CRN") (*see* Am. Compl. Ex. C [ECF No. 24–3]). (*See* Am. Compl. ¶ 45). The First CRN accused Northwestern of wrongfully terminating Kafie's disability benefits. (*See* First CRN 4). After the judgment in the breach-of-contract case, Kafie filed a second CRN (the "Second CRN") (Am. Compl. Ex. D [ECF No. 24–4]) that focused on Northwestern's post-trial refusal to negotiate a buyout of Kafie's policies.

Case No. 11-21251-CIV-ALTONAGA/Simonton

This CRN was accepted by the Department of Financial Services on August 12, 2010. (*See* Am. Compl. ¶ 47).

**C.    The First Motion to Dismiss and the July 18, 2011 Order**

In his original Complaint filed April 8, 2011, Kafie alleged two statutory bad-faith claims. (*See* Compl.)  In Claim I, Kafie alleged violations of section 624.155(1)(b)(1), and of four sub-provisions of Florida Statute section 626.9541 ("section 626.9541"), specifically sections 626.9541(1)(i)(3)(a), 626.9541(1)(i)(3)(d), 626.9541(1)(i)(2), and 626.9541(1)(i)(3)(b). (*See id.* ¶ 39).  Kafie's claim under section 624.155(1)(b)(1) was premised on Northwestern's alleged "fail[ure] to attempt to settle Plaintiff's claim for a reasonable buyout in good faith." (*Id.* ¶ 39(7)).  In Claim II, Kafie alleged that Northwestern's acts with respect to the matters alleged in the Complaint merit punitive damages. (*See id.* ¶¶ 43–45).

In the First Motion to Dismiss, Northwestern argued that Kafie's claim for Northwestern's failure to settle a buyout must be dismissed because he sought relief not available under Florida law. (*See* First Mot. 3).  Northwestern argued that Kafie is not entitled to a buyout of his Policies (*see id.* 5–10), and that the Second CRN on which Kafie's claim was premised was deficient under the statute (*see id.* 12–15).  Northwestern further contended that Kafie did not provide sufficient notice of the alleged violations of section 626.9541 in either the First or Second CRN, and that the factual allegations presented were insufficient to state a claim for these violations. (*See id.* 15–18).  Northwestern also asserted that the CRNs failed to provide notice of a punitive damages claim, and that the factual allegations in the Complaint were insufficient to state such a claim. (*See id.* 18–20).

In the July 18, 2011 Order, the Court dismissed the Complaint without prejudice. (*See* July

7

Case No. 11-21251-CIV-ALTONAGA/Simonton

18, 2011 Order). The Court observed that the same statutory violations underlie Claims I and II (*see id*. 7), and that Kafie did not state a claim under any of the statutory provisions invoked (*see id*. 12). Kafie's allegation that Northwestern did not attempt in good faith to buy out his benefits is based on conduct described in the Second CRN, which Kafie oddly stated did not support this allegation. (*See id*. 7–8). The Court reasoned that if neither the First nor the Second CRN supported the allegations regarding the failure to negotiate a buyout, Kafie did not state a claim under Florida Statute section 624.155(1)(b)(1). (*See id*. 8). Furthermore, to state a claim under section 626.9541(1)(i)(3)(a), Kafie would have to "allege particular deficiencies in Northwestern's investigative procedures or, at least, more facts about his interaction with Northwestern from which the Court could reasonably infer there are inadequate investigative procedures in place," which Kafie did not do in the Complaint. (*Id*. 9). Similarly, Kafie would need to allege factual matter to state a claim under section 626.9541(1)(i)(3)(d). (*See id*. 10). The Court found that Kafie did not describe any alleged misrepresentations by Northwestern about the net present value of Kafie's benefits with sufficient particularity to meet the pleading standards of Federal Rule 9(b), and thus his claims under sections 626.9541(1)(i)(2) and 626.9541(1)(i)(3)(b) were dismissed. (*See id*. 10–12).

The Order identified several areas in which the Complaint was deficient. In response, Kafie filed an Amended Complaint, alleging violations of the same statutory provisions as he had in the original Complaint. (*See* Am. Compl. ¶ 54). Although he alleges just one claim of statutory bad faith, he again asks for punitive damages. (*See id*. ¶ 57). Given that Kafie makes allegations under the same statutory provisions previously identified in the Complaint, the Court examines whether Kafie has alleged factual matter in the Amended Complaint that addresses the deficiencies the Court

Case No. 11-21251-CIV-ALTONAGA/Simonton

identified in the July 18, 2011 Order.  The Second Motion again challenges the Amended Complaint for failure to state a claim, and argues the "[t]he only difference in the Amended Complaint, is that Plaintiff has combined the two original counts into one count."  (Second Mot. 2).

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1949).

Additionally, Federal Rule of Civil Procedure Rule 9(b) requires that a plaintiff plead material misrepresentations or omissions with particularity.  The particularity rule alerts defendants to their precise misconduct and protects defendants against baseless charges of fraudulent behavior. *See Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988).

9

Case No. 11-21251-CIV-ALTONAGA/Simonton

## III. ANALYSIS

The Amended Complaint contains statutory bad-faith claims based on alleged violations of section 624.155. Section 624.155 allows a person to sue an insurer when the person is damaged by an insurance company's violation of specifically enumerated statutory provisions. *See* FLA. STAT. §§ 624.155(1)(a)1–6. Kafie identifies five of these provisions as bases for his claim. He asks for damages in excess of $75,000, the present value of the future benefits under the Policies, punitive damages, attorneys' fees, costs, and pre-judgment interest. (*See* Am. Compl. ¶ 57). The Court addresses the statutory violations identified in Kafie's Amended Complaint seriatim.

### A.  Section 624.155(1)(b)(1): Failure to Attempt to Settle Claim in Good Faith

In his original Complaint, Kafie alleged Northwestern did not attempt in good faith to settle his "claim for a reasonable buyout of his disability benefits." (Compl. ¶ 39). In the July 18, 2011 Order, the claim under section 624.155(1)(b)(1) was dismissed "because the first CRN does not discuss Northwestern's alleged failure to negotiate in good faith." (July 18, 2011 Order 8).

In his Amended Complaint, Kafie again alleges that Northwestern failed to settle his claim in good faith under section 624.155(1)(b)(1). (*See* Am. Compl. ¶ 54(a)). Northwestern now contends that Kafie is re-alleging the same claim as in the original Complaint and seeking damages for Northwestern's failure to negotiate a buyout of Kafie's Policies on the basis of the First CRN, which does not mention the settlement negotiations. (*See* Second Mot. 4). Kafie clarifies, however, that the Amended Complaint modified his claim in that he now states a "traditional § 624.155(1)(b)1 cause of action based on Defendant's failure to settle Kafie's original benefits claim during the sixty-day safe harbor period following the first CRN." (Resp. 3 [ECF No. 36]). Kafie now seeks to

10

recover his future benefits, not as damages for Northwestern's failure to negotiate as described in the Second CRN, but "as a measure of damages attendant to Kafie's traditional first-party bad faith claims under § 624.155 and § 626.9541," which were based on Northwestern's *original* failure in early 2009 to settle his claim.  (*Id*. 15).  This failure to settle Kafie's claim is what is described in the First CRN.  (*See* Am. Compl. Ex. C).

The case of *Dadeland Depot, Inc. v. St. Paul Fire and Marine Insurance Co.*, 483 F.3d 1265 (11th Cir. 2007), considered the Florida Supreme Court's disposition of five certified questions, including questions regarding the conditions precedent to bringing a section 624.155(1)(b)(1) claim. The Florida Supreme Court stated that "a plaintiff bringing a § 624.155(1)(b)(1) action for an insurer's bad-faith refusal-to-settle a claim only needs to establish the validity of the underlying claim."  *Id*. at 1270 (citing *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1234 (Fla. 2006)).  This threshold is satisfied by alleging that "a determination has been made with regard to the existence of liability on the part of an uninsured principal and the extent of the plaintiff's damages."  *Id*.  (quoting *Dadeland Depot, Inc.*, 945 So. 2d at 1234) (internal quotation marks and alterations omitted).  *See also Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So. 2d 1289, 1291 (Fla. 1991) (holding that an insured's claim against an insurer for bad faith accrues upon a determination of the existence of liability on the part of the insurer and the extent of the plaintiff's damages); *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1273–74 (Fla. 2000) ("We hold that the payment of the policy limits by the insurer here is the functional equivalent of an allegation that there has been a determination of the insured's damages.  It satisfies the purpose for the allegation — to show that the insured had a valid claim" for bad faith.).

Case No. 11-21251-CIV-ALTONAGA/Simonton

Kafie has alleged facts demonstrating a determination of liability on the part of Northwestern for its failure to settle his claim, and of the extent of Kafie's damages under the Policies. These determinations occurred at the trial following which a verdict was entered for Kafie on all counts, finding him disabled and entitled to benefits under the Disability Policy as well as a premium waiver under the Life Policy. (*See* Am. Compl. ¶ 37; *Kafie*, Case No. 09-20948-Civ-Ungaro).

Kafie is therefore eligible to make a claim under section 624.155(1)(b)(1). In order to properly state a claim, however, he must also demonstrate compliance with the procedure set forth in section 624.155, namely the requirement to give notice of his claim to the insurer in the CRN. The CRN "shall state with specificity the following information, and such other information as the department may require":

> 1. The statutory provision, including the specific language of the statute, which the authorized insurer allegedly violated. 2. The facts and circumstances giving rise to the violation. 3. The name of any individual involved in the violation. 4. Reference to specific policy language that is relevant to the violation, if any. If the person bringing the civil action is a third party claimant, she or he shall not be required to reference the specific policy language if the authorized insurer has not provided a copy of the policy to the third party claimant pursuant to written request. 5. A statement that the notice is given in order to perfect the right to pursue the civil remedy authorized by this section.

FLA. STAT. § 624.155(3)(b). "[S]trict compliance with the statute is required" in providing a proper CRN. *Erhard v. Hartford Accident & Indem. Co.*, No. 07-60532-CIV, 2008 WL 203583, at *5 (S.D. Fla. Jan. 23, 2008) (citing *Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1283 (Fla. 2000)). Northwestern concedes that Kafie's First CRN supports an alleged violation of section 624.155(1)(b)(1) for failure to settle Kafie's original claim for benefits in bad faith. (*See* Reply 4).

Case No. 11-21251-CIV-ALTONAGA/Simonton

The Court also finds that the First CRN meets the requirements of section 624.155(3)(b). Northwestern's argument that Kafie's bad-faith claim should be dismissed, however, is premised on the damages Kafie seeks on his claim. Northwestern argues that Kafie's bad-faith claim cannot stand where the relief he seeks in damages is unavailable under Florida law. (*See* First Mot. 5–10; Second Mot. 4–5; Reply 2).

Section 624.155 allows a plaintiff to recover certain "reasonably foreseeable" damages as a result of an insurer's bad faith. Specifically, section 624.155 states:

> The damages recoverable pursuant to this section shall include those damages which are a reasonably foreseeable result of a specified violation of this section by the authorized insurer and may include an award or judgment in an amount that exceeds the policy limits.

FLA. STAT. § 624.155(8) (emphasis added).

The Florida Supreme Court has provided some guidance on what section 624.155 bad-faith damages may entail. The court in *Talat* explained that before section 624.155 was adopted, an insured's only remedy against an insurer who acted in bad faith was to recover damages contemplated under the policy. *See* 753 So. 2d at 1281. The adoption of section 624.155 thus permitted an insured to recover *extra-contractual* damages. *See id*. In fact, extra-contractual damages are precisely the remedy envisioned by the statute when an insurer does not "cure" its bad faith by paying contractual damages within the 60-day window after the CRN is filed. *Id*. at 1283. This statutory remedy underscores the importance of providing notice in the CRN of a potential violation. *See id*. at 1283–84 ("Pursuant to the statue, there is no remedy until the notice is sent by the insured and the insurer has the opportunity to 'cure' the violation."). As long as such notice is provided, however, the insurer has an opportunity to avoid bad-faith litigation and extra-contractual

13

Case No. 11-21251-CIV-ALTONAGA/Simonton

damages altogether by paying the contractual damages within the 60-day window.  *See id.* at 1283.

If the insurer chooses not to do so, it runs the risk of bad-faith litigation and being found liable for

additional damages not specified by the policy agreement.

Thus, Kafie may *not* seek any contractual damages under the Policies in this bad-faith action.

In light of Kafie's earlier litigation with Northwestern,[4] the doctrine of *res judicata* also prevents the

Court from revisiting or awarding damages available to Kafie within the scope of the Policies.  *See*

*Magaldi v. Safeco Ins. Co. of Am.*, No. 10-80280-Civ, 2010 WL 2542011, at *2 (S.D. Fla. June 22,

2010) (finding that where plaintiff litigated scope of insurance policy's coverage in previous suit,

plaintiff was barred by *res judicata* from seeking further sums allegedly due under the policy for the

same loss in a second suit).

In the Amended Complaint, Kafie alleges that he lost income, lost his home as a result of

inability to afford mortgage payments, and had his vehicle repossessed.  (*See* Am. Compl. ¶ 27).

Northwestern asserts that Kafie lost his home while still receiving his benefits (*see* Second Mot. 18),

to which Kafie responds that he lost a different home than the one Northwestern identified (*see* Resp.

18).  Viewing the allegations of the Amended Complaint in the light most favorable to Kafie, the

Court accepts that Kafie has "lost a home" as a result of losing his benefits.  Northwestern does not

contest Kafie's claims with respect to lost income or his repossessed vehicle.  With respect to these

damages, at least, Kafie's bad-faith claim may proceed.

The greatest point of contention between the parties, however, is with respect to the present

---

[4] Kafie was awarded $66,496 plus interest as damages under the Policies.  *See* No. 09-20948-Civ-Ungaro [ECF No. 64].

14

Case No. 11-21251-CIV-ALTONAGA/Simonton

value of Kafie's future unaccrued benefits.  Kafie acknowledges that Florida law does not clearly provide for that remedy in this context, as he calls it an "issue of first impression."  (Resp. 17). Northwestern insists that Florida law precludes such a remedy, and cites several authorities for its position.  (*See* First Mot. 5–10; Second Mot. 4–5; Reply 2).  Nonetheless, the authorities cited by Northwestern all appear readily distinguishable from the present case.[5]  At most, the cases Northwestern cites establish that unless a plaintiff has shown eligibility for punitive damages, a plaintiff's claimed damages must be compensatory.  *See, e.g.*, *McLeod*, 591 So. 2d at 624, *MCI Worldcom Network Servs., Inc. v. Mastec, Inc.*, 995 So. 2d 221, 223–24 (Fla. 2008)  Yet these cases do not expressly say that an award of future damages cannot at the same time be compensatory.

In contrast, Kafie points the Court to authorities that stand for the proposition that compensatory damages may include a lump-sum award of the present value of future benefits under an insurance policy.  *See, e.g.*, *Wright v. UNUM Life Ins. Co.*, No 2:99-2394-23, 2001 WL 34907077, at *11–12 (D.S.C. Aug. 31, 2001) (allowing plaintiff to allege future policy benefits as part of consequential compensatory damages in tort from insurer's bad faith refusal to settle claims); *Greenberg v. Paul Revere Life Ins. Co.*, 91 F. App'x 539, 541 (9th Cir. 2004) (noting that under Arizona law, an award of future damages is consistent with tort requirement of "direct and

---

[5]  *McLeod v. Continental Insurance Co.*, 591 So. 2d 621 (Fla. 1992), dealt with whether the "excess judgment," or shortfall between all available insurance coverage and the amount of a verdict in a wrongful death action constituted compensatory damages under section 624.155.  *Id.* at 623.  The court found that the excess judgment represented damage caused by the tortfeasor, not the insurance company, and therefore was not properly awarded under the statute.  *Id.* at 624.  Kafie is alleging that Northwestern caused his damages, and the fact pattern in *McLeod* is therefore inapposite.  *Klein v. John Hancock Mutual Life Insurance Co.*, 683 F.2d 358 (11th Cir. 1982), *Aetna Life Insurance Co. v. Smith*, 345 So. 2d 784 (Fla. 4th DCA 1977), and *Fritz v. Standard Security Life Insurance Co. of New York*, 676 F.2d 1356 (11th Cir. 1982), cited by Northwestern, all involved solely breach-of-contract damages, which are not applicable here.

15

proximate" causation "where there is evidence that (1) the insured will continue to be 'entitled' to disability benefits, and (2) the insurer will continue to deny those benefits") (footnote call numbers omitted); *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1185 (10th Cir. 2005) (holding that trial court has "broad discretion" in bad-faith insurance cases, including potential award of future benefits given circumstances of case). The Court notes that some of these cases analyze future benefits as a tort remedy, which may be analogous to, or at least not inconsistent with, the language of section 624.155 awarding "reasonably foreseeable" damages. The authorities cited by both parties, therefore, have not convinced the Court that unaccrued policy benefits cannot be awarded as compensatory damages under section 624.155.

The Court declines to dismiss Kafie's bad-faith claim. Kafie has alleged sufficient facts to state a section 624.155 claim, and the compensatory damages Kafie seeks are not a basis for dismissing the claim at this stage.

**B. Section 626.9541(1)(i)(3)(a): Failure to Adopt and Implement Standards for Proper Claims Investigation**

In his original Complaint, Kafie alleged Northwestern "failed to adopt and implement standards for the proper investigation of claims." (Compl. ¶ 39(b)). The Court found no factual support for Kafie's conclusory allegation. (*See* July 18, 2011 Order 10). The July 18, 2011 Order stated that "in order to state a bad-faith claim based on a violation of section 626.9541(1)(i)(3)(a), Kafie will have to allege particular deficiencies in Northwestern's investigative procedures or, at least, more facts about his interaction with Northwestern from which the Court could reasonably infer there are inadequate investigative procedures in place." (*Id*. 9). In his Amended Complaint, Kafie adds 11 paragraphs under the heading, "Northwestern Mutual's Claims Handling Conduct."

Case No. 11-21251-CIV-ALTONAGA/Simonton

(Am. Compl. ¶¶ 17–27).  The Amended Complaint now alleges, *inter alia*, that Northwestern did not consult with Kafie's treating physicians during its investigation (*see* Am. Compl. ¶¶ 18–19); that Northwestern's physician consultant, Dr. Marilyn Kay, was not qualified to review Kafie's condition (*see id*. ¶ 20); that Northwestern failed to supply Dr. Kay with adequate copies of Kafie's medical records (*see id*. ¶ 21); that Northwestern never requested or obtained an independent medical examination (*see id*. ¶ 22); and that Northwestern's investigation did not adequately assess Kafie's duties and abilities as a podiatrist (*see id*. ¶¶ 23–24).

Kafie has alleged sufficient facts to state a claim under section 626.9541(1)(i)(3)(a). Nonetheless, in the Second Motion Northwestern contends that apart from a failure to allege sufficient facts, Kafie's First CRN does not provide sufficient notice of any potential violation of section 626.9541(1)(i)(3)(a), and that Northwestern thus never had an opportunity to cure any potential violations of that section.  (*See* Second Mot. 6–7).

It is true that the First CRN does not describe Northwestern's investigation, or lack thereof, in great detail.  It does state that section 626.9541(1)(i)(3)(a) has been violated and includes the specific language of the statute.  (*See* Am. Compl. Ex. C).  It further references Northwestern's "incorrect determination" that Kafie was not entitled to disability benefits.  (*Id*.).  Perhaps the closest the First CRN comes to describing the investigation itself is stating, "An assortment of improper and illegal claim procedures is already apparent on the face of the materials provided to date, but others are likely concealed in the claim file which we have not yet seen."  (*Id*.).

Section 625.155 provides that the CRN "shall be on a form provided by the [Florida Department of Financial Services]." FLA. STAT. § 624.155(3)(b). "[B]ecause the department's form

17

Case No. 11-21251-CIV-ALTONAGA/Simonton

gives only minimal space for describing 'the facts and circumstances giving rise to the violation,' it would be very strange if an insured was required to incorporate every allegation from its complaint into its notice." *Tropical Paradise Resorts, LLC v. Clarendon Am. Ins. Co.*, No. 08-60254-CIV, 2008 WL 3889577, at *4 (S.D. Fla. Aug. 20, 2008) (citation omitted); *Mayfair House Ass'n, Inc. v. QBE Ins. Corp.*, No. 09-80359-CIV, 2009 WL 2132704, at *3 (S.D. Fla. July 14, 2009) (stating that "an insured is not required to incorporate every allegation from its complaint into its civil remedy notice under § 624.155(3)(b)").

The mention of Northwestern's "improper and illegal claim procedures" in the First CRN (*see* Am. Compl. Ex. C), combined with Kafie's inclusion of the relevant statutory provision and language, is sufficient to provide Northwestern with notice and an opportunity to cure a potential violation of section 626.9541(1)(i)(3)(a).[6]  Also relevant is the fact that the Florida Department of Financial Services accepted the First CRN on March 14, 2009.  (*See* Am. Compl. ¶ 45).  *See also Tropical Paradise Resorts*, 2008 WL 3889577, at *4 ("As further evidence that Tropical's notices were sufficient, it bears noting that the notices were accepted by the Department of Financial Services for purposes of starting the 60-day clock.").  Had the Department of Financial Services deemed the First CRN provided insufficient information, it should have returned it to Kafie within 20 days of receipt.  *See* Fla. Stat. § 624.155(3)(c).

---

[6] *Cf. Nowak v. Lexington Ins. Co.*, 464 F. Supp. 2d 1248 (S.D. Fla. 2006).  The court in *Nowak* dismissed the plaintiff's section 626.9541(1)(i) claim at the summary-judgment stage because the plaintiff's CRN briefly described the defendant insurance company's refusal to settle his claim and invoked section 624.155, *id*. at 1250 n.3, but failed to mention section 626.9541(1)(i).  *Id*. at 1251.  The court noted that the plaintiff had not checked the box labeled "626.9541(1)(i)" on the CRN form.  *Id*. at 1252.  Here, Kafie did do the equivalent on his First CRN.

18

Case No. 11-21251-CIV-ALTONAGA/Simonton

The Court therefore denies Northwestern's Second Motion with respect to allegations under section 626.9541(1)(i)(3)(a).

### C.  Section 626.9541(1)(i)(3)(d):  Failure to Conduct Reasonable Investigations

Similarly, Kafie alleges Northwestern "denied Plaintiff's claim without conducting a reasonable investigation based on available information."  (Am. Compl. ¶ 54(c)).  For the same reasons Kafie states a claim under section 626.9541(1)(i)(3)(a), he states a claim under section 626.9541(1)(i)(3)(d).

### D.  Section 626.9541(1)(i)(2):  Material Misrepresentation to Reduce Settlement

As he did in the original Complaint, Kafie maintains Northwestern made a material misrepresentation for the purpose of settling his claims on less favorable terms than those provided in his insurance contract, in violation of section 626.9541(1)(i)(2).  (*See* Am. Compl. ¶ 54(d)).  Such an allegation must satisfy Federal Rule of Civil Procedure 9(b).

To satisfy the standard under Rule 9(b), a plaintiff must allege "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citation and internal quotation marks omitted).

The Court previously found Kafie did not sufficiently describe the statements, where they were made, or how he was misled by them.  (*See* July 18, 2011 Order 11).  Kafie now quotes and provides dates and further context for the alleged misrepresentations.  (*See* Am. Compl. ¶¶ 42–43).

19

Case No. 11-21251-CIV-ALTONAGA/Simonton

However, he also clarifies that all of the alleged statutory violations, including those for misrepresentations, were perfected by his First CRN.  (*See* Resp. 3).  As a result, the portion of his claim based on alleged misrepresentations must fail because the First CRN did not, and logically *could not*, give Northwestern sufficient notice of its alleged misrepresentations.

In his Response, Kafie explains that his claim under section 626.9541(1)(i)(2) is based on Northwestern's alleged misrepresentation of "the present value of the policies in letters written between April and June 2010, and [asserts] its misrepresentation was material in that it sought to devalue the policies for settlement purposes, as prohibited by § 626.9541(1)(i)2." (*Id.* 10).  In other words, the alleged misrepresentations arose out of settlement negotiations *after* the verdict in the trial in which the issues raised in the First CRN were litigated.  The First CRN is obviously not so far-seeing as to cover events that are so attenuated.  Kafie, acknowledging this deficiency, urges the Court to adopt a rule that "[a] single CRN . . . encompasses all later bad faith conduct."  (Resp. 11).  Such a rule would contravene the plain language of the statute, which requires the insured to name "[t]he facts and circumstances giving rise to the violation," FLA. STAT. § 624.155(3)(b)(2), and in this case would require the First CRN to describe the misrepresentations.  Moreover, Kafie's proposed rule is belied by his own conduct, as he filed a Second CRN in August 2010 (*see* Am. Compl. ¶ 47), addressing the alleged misrepresentations that he now attempts to shoe-horn into the scope of the First CRN.  But Kafie as much as acknowledges, and the Court has no choice but to conclude, that the First CRN cannot support a claim for the alleged misrepresentations.

Because Kafie did not give notice of his allegations of misrepresentations in the First CRN, the portion of his claim related to such misrepresentations must be dismissed.  Kafie is also

20

precluded from pursuing any remedy under section 624.155 for these violations at this point since he has already been awarded his contractual damages at trial. *See Talat*, 753 So. 2d at 1283–84 (holding that section 624.155 only provides a remedy if the insurer has not paid contractual damages during 60-day "cure" period after CRN has passed).

### E.  Section 626.9541(1)(i)(3)(b): Misrepresentation of Facts or Provisions Relating to Coverage at Issue

Kafie alleges Northwestern "misrepresented pertinent facts or insurance policy provisions relating to coverages at issue" in violation of section 626.9541(1)(i)(3)(b).  (Am. Compl. ¶ 54(e)). The same alleged misrepresentations under section 626.9541(1)(i)(2) are at issue under section 626.9541(1)(i)(3)(b), and the portion of Kafie's claim based thereon is likewise dismissed.

### F.  Punitive Damages

Kafie has not stated a claim for punitive damages.  Section 624.155 requires that to state a claim for punitive damages, a plaintiff must demonstrate "the acts giving rise to the violation occur with such frequency as to indicate a general business practice *and* these acts are: (a) Willful, wanton, and malicious; (b) In reckless disregard for the rights of any insured; or (c) In reckless disregard for the rights of a beneficiary under a life insurance contract."  FLA. STAT. § 624.155(5) (emphasis added).  The only fact Kafie alleges that potentially supports punitive damages is that at least ten Florida claimants have filed CRNs against Northwestern since 2007 for violations of section 624.155(1)(b)(1).  (*See* Am. Compl. ¶ 49).  This allegation by itself does not provide enough factual matter for the Court to find Kafie has stated a claim for punitive damages.  At most, the allegation concerns the frequency of Northwestern's potential violations, although the Court has no way of knowing whether ten CRNs in four years is indeed frequent.  But in any case, Kafie has alleged no

Case No. 11-21251-CIV-ALTONAGA/Simonton

facts suggesting that the acts described in the CRNs are "[w]illful, wanton, and malicious," or "[i]n

reckless disregard for the rights" of an insured or a beneficiary.  FLA. STAT. § 624.155(5).  The claim

for punitive damages is therefore dismissed.

### IV.  CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Motion **[ECF No.**

**27]** is **GRANTED in part and DENIED in part**.  Defendant shall file an answer within the time

permitted by the Rules.

**DONE AND ORDERED** in Chambers, at Miami, Florida, this 27th day of September, 2011.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record