## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE No. 11-21251-CIV-ALTONAGA/Simonton

**GABY KAFIE**,

      Plaintiff,

vs.

**NORTHWESTERN MUTUAL**
**LIFE INSURANCE COMPANY**,

      Defendant.

_____/

### ORDER

**THIS CAUSE** is before the Court upon Defendant, Northwestern Mutual Life Insurance Company's ("Northwestern['s]") Motion for Final Summary Judgment and to Strike Portions of Plaintiff's Amended Complaint ("Motion") [ECF No. 65], filed on October 11, 2011. Plaintiff, Gaby Kafie ("Kafie"), filed a Complaint on April 8, 2011, containing two statutory bad-faith claims based on alleged violations of Florida Statute section 624.155 ("section 624.155"). (*See* Compl. [ECF No. 1]). Northwestern filed a motion to dismiss on May 26, 2011 for failure to state a claim ("First Motion to Dismiss") [ECF No. 10], which the Court granted on July 18, 2011. (*See* July 18, 2011 Order [ECF No. 23]). The Court granted Kafie leave to amend. (*See id.*).

Kafie filed his Amended Complaint on July 27, 2011, alleging one statutory bad-faith claim based on alleged violations of section 624.155. (*See* Am. Compl. [ECF No. 24]). Northwestern filed a second motion to dismiss the Amended Complaint for failure to state a claim on August 11, 2011 ("Second Motion to Dismiss") [ECF No. 27]. The Court granted the Second Motion to Dismiss in part and denied it in part, declining to dismiss Kafie's bad-faith

claim in its entirety, but dismissing the portion of Kafie's claim relating to alleged material misrepresentations and requesting punitive damages. (*See* Sept. 27, 2011 Order [ECF No. 51]). Kafie filed a motion for reconsideration of the Court's Order with respect to his claim for punitive damages on October 19, 2011 [ECF No. 67], which the Court granted on November 29, 2011. (*See* [ECF No. 83]).

Northwestern now brings this Motion for Summary Judgment asking the Court to dismiss Kafie's bad-faith claim and to strike certain allegations from the Amended Complaint as immaterial. (*See* Mot. 2–3). Kafie filed a Response in Opposition to the Motion ("Response") [ECF No. 71] on November 4, 2011, and Northwestern filed its Reply ("Reply") [ECF No. 75] on November 14, 2011. The Court has carefully considered the parties' written submissions, the record, and the applicable law.

## I.      BACKGROUND[1]

Northwestern issued Kafie a disability income insurance policy ("Disability Policy") [ECF No. 24-1], dated November 3, 2006. (*See* Statement of Material Facts ("SMF") ¶ 1 [ECF No. 65]). Benefits under the Policy are provided on a monthly basis. (*See id*. ¶ 2). Specifically, the Policy provides:

> **5.1 CLAIM FOR POLICY BENEFITS**
>
> *          *          *
>
> **Written Proof of Loss.**  Written proof of loss must be given to [Northwestern] within 90 days after the end of each monthly period for which benefits are claimed.  If the proof is not given within the 90 days, the claim will not be affected if the proof is given as soon as reasonably possible.  In any event, the proof required must be given no later than one year and 90 days after the

---

[1]  Unless otherwise noted, the facts are undisputed.

2

Case No. 11-21251-CIV-ALTONAGA/Simonton

end of each monthly period for which benefits are claims unless
the Owner was legally incapacitated.

*       *       *

**5.2 TIME OF PAYMENT OF CLAIMS**

When [Northwestern] has received satisfactory proof of loss and
other information as required by section 5.1 and [Northwestern]
has determined that benefits are payable, [Northwestern] will pay
benefits on a monthly basis.

(Disability Policy 13–14 §§ 5.1–5.2).

Northwestern also issued Kafie a whole-life insurance policy ("Whole Life Policy")
[ECF No. 24-2], dated December 12, 2008. (*See* SMF ¶ 3). The Whole Life Policy allows for an
annual waiver of its premium during periods when Kafie is totally disabled. (*See id*. ¶ 4). The
Whole Life Policy provides:

**Premium Waived On An Annual Basis**. Even if premiums have
been paid more often than every 12 months, a premium waived on
a Policy anniversary will be an annual premium.

(Whole Life Policy 26 § 1).

Kafie submitted a request to Northwestern in June 2008 for disability benefits related to
loss of vision. (*See* SMF ¶ 5 (citing June 2008 Request [ECF No. 65-1])). Northwestern initially
communicated its approval of Kafie's request in a letter dated July 1, 2008. (*See id*. ¶ 6 (citing
July 1, 2008 Letter [ECF No. 65-2])). The letter enclosed Kafie's first disability payment and
stated:

Future benefits are payable on the monthly payment date listed
above as long as we receive satisfactory proof of a continuing
disability. The enclosed Request for Continuance of Disability
Benefits form should be completed and returned as close as
possible to the date indicated on the form. This will ensure that we
receive current information when evaluating your continued

3

Case No. 11-21251-CIV-ALTONAGA/Simonton

eligibility for benefits.

(July 1, 2008 Letter 1).  After further evaluation, in a letter dated February 3, 2009, Northwestern informed Kafie that it was discontinuing his disability benefits.  (*See* SMF ¶ 7 (citing Feb. 3, 2009 Letter [ECF No. 65-3])).

Prior to the discontinuation of Kafie's benefits, Neil Kern ("Kern"), Northwestern's field consultant, interviewed Kafie at his residence.  (*See id.* ¶ 8 (citing Kern Report [ECF No. 65-4])).  In his Investigative Report, Kern wrote that Kafie stated he no longer drove, he used a large LCD screen to watch television, he no longer cooked due to his vision, and he could do limited computer work using special software to enlarge the size of characters on the screen.  (*See* Kern Report 5).  Kern also wrote Kafie reported he no longer shaved with a razor, but only used an electric shaver every two to three days, and that it took Kafie longer to dress himself and walk around the house.  (*See id.*).  During the interview Kern observed how Kafie's wife had to assist him to locate a computer on top of the table near where Kafie was sitting, and to sign a document by guiding Kafie's hand and pen.  (*See id.* 2).  Kafie "disputes the accuracy and fairness of Mr. Kern's report."  (Resp. to Northwestern's Statement of Material Facts ("SMFO") ¶ 8 [ECF No. 71]).

Also prior to discontinuing Kafie's benefits, Northwestern requested that Dr. Marilyn Kay ("Kay"), a neuro-ophthalmologist, conduct a review of medical records from Kafie's physicians.  (*See* SMF ¶ 9 (citing Oct. 30, 2008 Letter [ECF No. 65-5]; Dec. 1, 2008 Letter [ECF No. 65-6])).  Kafie disputes the "independen[ce]" of Kay's review.  (SMFO ¶ 9).  Kay wrote in her evaluation that since Kafie's "visual fields are normal[;] there's no need for him to be visually limited or have any restrictions on activities.  With his normal visual fields there's

4

absolutely no reason for him to be prohibited from driving." (Dec. 1, 2008 Letter 2). Kay wrote that in her opinion,

> Kafie has had stable mild central serous chorioretinopathy which was stable even as far back as November 2007 and certainly there's no evidence of activity in subsequent examinations. His normal visual fields of September 2008 combined with normal visual acuity at near in July 2008 suggests that his visual functioning is quite excellent.

(*Id*. 3). Northwestern also requested a third-party surveillance report of Kafie's activities during a several-day period. (*See* SMF ¶ 10 (citing Spectrum Report [ECF No. 65-7])). Northwestern states that Kafie's activities, as observed in the surveillance video, were inconsistent with the information he previously provided to Northwestern. (*See id.*). Kafie "disputes the accuracy and fairness of the surveillance report," and asserts that activities shown in the surveillance video are consistent with information provided to Northwestern. (SMFO ¶ 10).

Prior to the discontinuation of Kafie's benefits, and while Kafie was receiving benefits, Kafie's mortgage to a property in Miami Lakes was foreclosed. (*See* SMF ¶ 11 (citing Foreclosure Documents [ECF No. 27-1])). Following the discontinuation, Kafie did not have a mortgage. (*See id.* ¶ 12 (citing Deposition of Gaby Kafie, Sept. 27, 2011 ("Kafie Dep.") 60:12–61:24; 68:5–73:20; 74:9–76:4 [ECF No. 65-8])). During his deposition, Kafie did not testify he has lost future policy benefits. (*See id.* ¶ 13 (citing Kafie Dep. 51:23–68:4; 106:12–113:20); SMFO ¶ 13).

Kafie sued Northwestern in 2009 for breach of the Disability Policy and Whole Life Policy (collectively, "Policies"). (*See* SMF ¶ B.1. (citing *Kafie v. Northwestern Mut. Life Ins. Co.*, No. 09-cv-20948-Ungaro ("*Kafie I*"))). Following a bench trial, Judge Ursula Ungaro found

in Kafie's favor, and awarded him his outstanding policy benefits plus statutory interest.  (*See id.*

¶ B.2. (citing *Kafie I* Final Judgment [ECF No. 64])).  In announcing her findings in open court,

Judge Ungaro stated in part:

> . . . I don't think this is an easy case because I do suspect that there were times when Dr. Kafie, for whatever reason, has exaggerated his condition.  The Kern interview is particularly disturbing.  [It] [s]eems obvious to me that Dr. Kafie . . . believed that it was in his interest to grossly exaggerate the level of his impairment.
>
> And these other things that have been brought up by Northwestern Mutual are disturbing, because the case does come down to credibility.  But, having said that, maybe Dr. Kafie is the luckiest man on Earth . . .
>
> So, I have to say that everything that Northwestern Mutual has brought up that goes against Dr. Kafie is disturbing.  It's caused me to think hard about the case.  But I do not think that Northwestern Mutual has shown by a preponderance of the evidence that Dr. Kafie does not have an impairment that prevents him from practicing podiatric medicine.

(*Id.* (quoting *Kafie I* Trial Tr. 33:13–35:25 [ECF No. 59])).  These statements are not contained

in the *Kafie I* court's Findings of Facts and Conclusions of Law.  (*See* SMFO ¶ B.2. (citing *Kafie*

*I* Findings of Facts and Conclusions of Law ("*Kafie I* Findings") [ECF No. 71-3])).

Northwestern has fully satisfied the *Kafie I* Final Judgment to date.  (*See* SMF ¶ B.3.).

## II.    STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c).  In making its assessment of summary judgment, the Court

"must view all the evidence and all factual inferences reasonably drawn from the evidence in the

light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### III.    ANALYSIS

Northwestern makes several arguments in favor of summary judgment.  The Court addresses each one in in turn.

#### A.    Whether a reasonable jury could find for Kafie

Northwestern asserts that Kafie has not produced enough evidence to establish a triable issue of fact as to Northwestern's bad faith in handling his claim.  "It has long been the law of [Florida] that an insurer owed a duty of good faith to its insured." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004) (citing *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)).  In order to demonstrate good faith, "[t]he insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."  *Id.* (quotation omitted).  The question of bad faith extends to the insurer's "entire conduct in the handling of the claim." *Id.*  "In Florida, the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard."  *Id.* at 680 (citing *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 63 (Fla. 1995)).

"[O]rdinarily 'the question of failure to act in good faith with due regard for the interests of the insured is for the jury.'"  *Id.* at 680 (quoting *Gutierrez*, 386 So. 2d at 785).  In fact, the Florida Supreme Court made the task of granting summary judgment in bad-faith actions significantly more difficult when it explicitly retreated from the "fairly debatable" standard — that an insurer would be found to have acted in bad faith only when the disputed claim was not "fairly debatable." *Laforet*, 658 So. 2d at 63.

Northwestern contends there is no triable issue here because Kafie's claim "is based on the bare contention that Northwestern Mutual incorrectly determined that Plaintiff was not disabled. However, this is not actionable conduct." (Mot. 8). Northwestern asserts Kafie "could not provide any specifics" about Northwestern's bad faith. (*Id*.). Drawing from various statements Kafie made at his deposition, Northwestern asserts Kafie's argument that the Kern Report included a misstatement about Kafie using the wall in order to walk is insufficient. (*See id*. 8–9). Northwestern also calls Kafie's reference to Kay's opinion letter at his deposition insufficient. (*See id*. 9). Northwestern contends Kafie's testimony that Kay was not a retinal specialist, and that the records available to her were of poor quality and incomplete, is also speculative and insufficient. (*See id*.). According to Northwestern, to preclude summary judgment, Kafie must provide evidence suggesting a specialist would have made conclusions materially different from those Kay reached, and that the missing records would have led to a different result. (*See id*.).

In addition, Northwestern calls "illusory and ineffectual" Kafie's statement that Northwestern treated his claim as if he were a "bus driver" rather than a podiatrist with special duties. (Mot. 9 (quoting Kafie Dep. 42:10–43:25)). According to Northwestern, Kafie "does not identify any [professional] duty that Northwestern Mutual failed to take into account, or how that duty should have altered the Company's evaluation." (*Id*.).

Finally, Northwestern asserts Kafie's complaints about the surveillance report — that it did not relate to his professional duties and misrepresented how many times he drove — are insufficient to defeat summary judgment. (*See* Mot. 9). Northwestern contends Kafie does not dispute he was observed driving and "engag[ing] in many other activities that were inconsistent

with his prior representations to [Northwestern]." (*Id*.). These points were included in the evaluation of Kafie's claim in the February 3, 2009 letter communicating the discontinuation of benefits, and Northwestern calls them "undisputed." (*Id*.). Northwestern also states Judge Ungaro struggled with these issues when she noted the case was not an easy one. (*See* SMF ¶ B.2.).

Northwestern's approach is somewhat odd, given that it directs the Court to several points in the record that seem to militate against a finding of undisputed material facts, particularly in light of the presumption against summary judgment on issues of bad faith. When asked why he was suing Northwestern for bad faith, Kafie stated at his deposition, "I strongly believe that Northwestern Mutual did not give me a fair chance. . . . Northwestern Mutual since day one has kind of treated me as if I have been the enemy." (Kafie Dep. 21:23–22:9). Kafie spoke largely in generalities, but when pressed for specifics, he also stated that "[s]uggestions were ignored. Recommendations were thrown out the window," and a reviewing doctor recommended calling Kafie's ophthalmologist before terminating his claim, to no avail. (*Id*. 33:8–9; 33:20–22). Kafie also contends Kern's testimony in *Kafie I* and Kern's observations evince "biased interpretations of [Kafie's] physical and bodily movements." (*Id*. 34:16–19). According to Kafie, Kern wrongfully assumed facts about the foreclosure of Kafie's home. (*Id*. 36:9–13).

Kafie also asserted at his deposition that his "file was reviewed by a physician that was not an expert in the field of central serous chorioretinopathy." (*Id*. 41:3–5). He further referred to the fact that Kay had poor quality copies and incomplete records to review. (*See id*. 41:7–12). Indeed, Kay wrote in her evaluation that "[s]ome of the records supplied, not the color OCT, are

Case No. 11-21251-CIV-ALTONAGA/Simonton

of too poor quality to interpret.  Even the color copy of the OCT is extremely minified in some regards[;] it's difficult to read."  (Dec. 1, 2008 Letter 3).  Kafie further notes Northwestern did not treat his claim as "profession specific," that Kern never asked him about his profession, and that Northwestern did not even know the specifics of his profession until litigation for *Kafie I*. (Kafie Dep. 43:8–44:8).    Moreover, Kafie points out inaccuracies in Northwestern's interpretation of the surveillance video, with respect to his driving in particular, and states the tape shows a "biased view."    (*Id.* 45:12–46:25).    He claims Spectrum Investigations "manipulated the video" to show what was convenient for it to be re-hired by Northwestern.  (*Id.* 47:1–9).    In his Response, therefore, Kafie points to these alleged shortcomings in Northwestern's handling of his claim.

Northwestern insists, however, that none of this conduct is material to the Court's determination, because Kafie cannot demonstrate Northwestern's purported actions, or lack thereof, made any difference to its evaluation.  (*See* Reply 4).    Northwestern calls Kafie's argument "impermissible speculative inference."  (*Id.*).    While some of Kafie's arguments are certainly based on inference, that is hardly impermissible.  They address the standard under the law of bad faith, as they are relevant to Northwestern's overall conduct in investigating and handling Kafie's claim, under the totality of the circumstances.

Northwestern's corporate representative, Hyde, confirmed that the decision to terminate Kafie's benefits turned on Northwestern's evaluation of Kafie's credibility.  She stated that Northwestern "felt that [Kafie] had no credibility, [it] could not believe anything that he had been telling [Northwestern]."  (Hyde Dep. 50:1–2).  Hyde stated that by the time Kafie's claim was denied, Northwestern did not believe he was disabled by his medical condition.  (*See id.*

11

Case No. 11-21251-CIV-ALTONAGA/Simonton

50:9–16). According to Hyde, Northwestern did not know Kafie's motivation for stopping work and filing a claim. (*See id*. 50:17–21). The importance of credibility was particularly salient given that Northwestern considered Kafie's claims to be "subjective," or self-reported, and noted that his doctors' reports were based on what he imparted to them. (Deposition of Cheryl Cox-Newsom, October 11, 2011 ("Cox-Newsom Dep.") 48:22–49:2; 51:4–25 [ECF No. 71-2]).

With respect to Kafie's credibility, Northwestern appears to have largely denied Kafie's claim based on inconsistencies between his observed conduct and his statements to Kern during his interview. Hyde explained, "for every claim we have to look at credibility. And the way we do that is, we look at . . . consistency between all the information that we get." (Hyde Dep. 113:18–21). Northwestern stated in the February 3, 2009 letter denying Kafie benefits:

> Please also note that even if the medical documentation would have supported limitations, your activities were inconsistent with your claimed limitations/restrictions. We reviewed the documentation related to your activities. Although, all of the activities listed above does [sic] not require the use of visual acuity, fine motor skills, and hand to eye coordination that you stated to be important in your occupation as a podiatrist, the activities are inconsistent with the medical documentation and your claimed restrictions and limitations.

(Feb. 3, 2009 Letter 4). Northwestern continued, "[b]ased on the evaluation of the medical documentation, you have not appropriately and accurately reported your visual abilities to the treating physicians, therefore, they were restricting you from your occupational duties without all the facts." (*Id*. 5). Kafie identifies sufficient factual matter to raise an issue of fact with respect to the way Northwestern investigated and assessed his credibility, using Kay and Kern.

Finally, it is worth noting Judge Ungaro's findings in *Kafie I*. According to Northwestern, these findings are inadmissible, and no lay witness may testify on an

12

interpretation of the findings.  (*See* Reply 6).   Northwestern asserts the only relevant piece of information to come out of *Kafie I* is that it denied Kafie's claim.  (*See id.*).   Nevertheless, the Court may take judicial notice of the Findings of Fact and Conclusions of Law in *Kafie I*, not for their truth, but for the limited purpose of establishing the "judicial act" they represent.  *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).   Here, the Court considers them relevant as to the existence of an issue of fact.   The court in *Kafie I* found Kay's review was based solely on her examination of Kafie's doctors' reports — she did not personally examine Kafie.  (*See Kafie I* Findings ¶ 13).   Kay did not dispute Kafie's diagnosis or that he suffered from retinal scarring, but she found inconsistencies in his visual fields and concluded he had exaggerated his condition, and likely had no impairment at all.  (*See id.* ¶ 14).   The court found, nonetheless, that Kay could not rule out the possibility that Kafie was impaired by his condition to the extent and manner he described.  (*See id.* ¶ 25).   The court also found Northwestern offered no testimony on the degree of impairment that would affect his duties as a podiatrist.  (*See id.* ¶ 16).   Moreover, the court found the surveillance video ambiguously showed only a single episode of Kafie driving, as opposed to his wife, and generally supported Kafie's claim of how he had altered his normal activities.  (*See id.* ¶ 17).

Whether or not these findings are true, that the court made them suggests the existence of an issue of fact in the present action as to how Northwestern handled Kafie's claim.   Summary judgment is not appropriate.

Case No. 11-21251-CIV-ALTONAGA/Simonton

**B.      Whether Plaintiff can recover (and is seeking) contractual benefits**

In the September 27, 2011 Order, the Court found that "the authorities cited by both parties . . . have not convinced the Court that unaccrued policy benefits cannot be awarded as compensatory damages under section 624.155." (Sept. 27, 2011 Order 16).  The Court therefore declined to dismiss the bad-faith claim on that basis.  (*See id*.).  Northwestern renews its earlier arguments, in a different form, with respect to the availability in a bad-faith action of lump-sum awards of the present value of future benefits under an insurance policy.  To a certain extent Northwestern is using the present Motion to seek reconsideration of the September 27, 2011 Order, without directly addressing the elements such a reconsideration request must meet. Nevertheless, the Court briefly addresses Northwestern's arguments.

Northwestern now asserts that unaccrued future benefits are contractual benefits and therefore cannot be awarded in this bad-faith action.  (*See* Mot. 10).  As the Court held in the September 27, 2011 Order, Kafie may not seek any contractual damages in this action.  (*See* Sept. 27, 2011 Order 14).  The Court finds Northwestern's argument here that unaccrued future benefits are a *contractual* remedy particularly troubling, given Northwestern's unequivocal statement that "the Policies do not provide for the lump-sum payment of unaccrued benefits" in its briefing for the Second Motion to Dismiss.  (*See* [ECF No. 40]).  Contractual remedies are, simply, those provided for by contract.  That the calculation of future benefits is *derived* from contract provisions does not render this remedy a contractual one, as all parties appeared to agree before this Motion was briefed.  The Policies do not allow Kafie to recover the present value of his unaccrued benefits — therefore this is not a contractual remedy.  The Court will not preclude him from recovering it in this action on that basis alone.

14

Case No. 11-21251-CIV-ALTONAGA/Simonton

Northwestern further asserts that authorities cited by Kafie in the briefing for the Second Motion to Dismiss are "traced" to *Egan v. Mutual of Omaha Insurance Co.*, 620 P. 2d 141 (Cal. 1979).   In *Egan*, the court discussed the possibility of awarding future policy benefits in a tort action for breach of the implied covenant of good faith and fair dealing, noting that "the jury may include in the compensatory damage award future policy benefits that they reasonably conclude, after examination of the policy's provisions and other evidence, the policy holder would have been entitled to receive had the contract been honored by the insurer."   620 P. 2d at 149 n.7. Northwestern argues that *Egan* based its reasoning on the California Civil Code, which allows for recovery of damage in tort that is "proximately caused . . . , whether it could have been anticipated or not."   CAL. CIV. CODE § 3333.   According to Northwestern, this standard is "diametrically opposed to Florida law," in which bad faith "is grounded in principles of contract law, not tort law."   (Mot. 12 (citing *Allstate v. Regar*, 942 So. 2d 969 (Fla. 2d DCA 2006); *N. Am. Van Lines, Inc. v. Lexington Ins. Co.*, 678 So. 2d 1325 (Fla. 4th DCA 1996))).   Northwestern asserts that the authorities cited in Kafie's briefs on the Second Motion to Dismiss and in the September 27, 2011 Order are accordingly all invalid as the progeny of *Egan*, or premised on a theory of contract repudiation, a claim not present in this action.   (*See id.* 12–13).

While bad-faith may in some cases be brought as a breach-of-contract action, the Florida Supreme Court in *Laforet* explained how bad-faith actions evolved at common law beginning in the 1930s, through the legislature's adoption of the *statutory* bad-faith action in section 624.155 in 1982, which extended the remedy to first-party actions by insureds against their insurers.   *See* 658 So. 2d at 58–59.   The court held that under section 624.155, "the damages allowed in a first-party action under the statute include only those damages that were the natural, proximate,

15

Case No. 11-21251-CIV-ALTONAGA/Simonton

probable, or direct consequence of the insurer's bad faith."  *See id*. at 60.

Therefore, it is worth emphasizing, that notwithstanding its common law origins, a claim under section 624.155 is an action governed by statute.  As the Court noted in the September 27, 2011 Order, that statute provides for recovery of "reasonably foreseeable" damages, a concept with some analogy in tort law.  (Sept. 27, 2011 Order 13, 16).  Cases examining the award of bad-faith damages in tort are therefore relevant to the extent they illuminate the "reasonably foreseeable" standard.  Indeed, the cases the Court discussed in the September 27, 2011 Order on this point all envisaged awards of future benefits as a remedy consistent with *tort*, not contract, principles.  (*See* Sept. 27, 2011 Order 15–16).[2]  To the extent that the court in *Egan* relied on the proposition that future benefits may be awarded in tort as long as they were "proximately caused," CAL. CIV. CODE § 3333, the Court does not see why *Egan* or the California Civil Code should be so alien to Florida law as Northwestern suggests.

Thus, the question for the Court, as it was in the September 27, 2011 Order, remains whether unaccrued future benefits may be consistent with an award of compensatory, reasonably foreseeable damages, as provided for by statute.  Northwestern still provides no authorities, evidence, or other reason indicating why they may not be.  The Court is not convinced by its argument that such damages are only possible when a contract has been repudiated.  As was the case in the Second Motion to Dismiss, Northwestern presents authorities addressing only actions for periodic payment of benefits under a policy — that is, breach-of-contract actions — not

---

[2] *Royal Maccabees Life Insurance Co. v. Choren*, 393 F.3d 1175 (10th Cir. 2005), involved bad-faith breach of contract, not a tort claim, and held that future benefits could potentially be awarded depending on the circumstances of the case.  The Court cited *Choren* for the proposition that district courts have broad discretion in fashioning bad-faith remedies (*see* Sept. 27, 2011 Order 16), but even the court in *Choren* examined bad-faith breach of contract damages under Colorado law in accordance with "*traditional tort principles*."  *Choren*, 393 F.3d at 1183 (emphasis added).

16

actions in tort or for statutory bad faith.  (*See* Mot. 10–11).  In fact, in *Aetna Life Insurance Co.*
*v. Smith*, 345 So. 2d 784 (Fla. 4th DCA 1977), upon which Northwestern primarily relies, the
court explicitly found there was no tort independent of the breach of contract.  345 So. 2d at 786.
The Court already found that *Aetna* and its ilk are not applicable to this action; Northwestern
fails to persuade that the finding should be revisited now.  (*See* Sept. 27, 2011 Order 15 n.5).

  The parties all agree this is an issue of first impression.  The Court sees no reason
unaccrued future benefits may not be awarded as compensatory damages under section 624.155
so long as they meet the "reasonably foreseeable" standard of that statute.  The Court will
therefore not grant summary judgment on Kafie's claims on this basis.

### C. Whether there is evidence of proximate causation between Northwestern's alleged conduct and Kafie's alleged damages

  Northwestern asserts Kafie has produced no evidence demonstrating Northwestern
proximately caused his alleged damages of unaccrued future policy benefits.  (*See* Mot. 14–15).
According to Northwestern, Kafie did not mention unaccrued benefits at his deposition.  (*See id.*
15).  After *Kafie I*, Northwestern has fulfilled the judgment, paying all outstanding benefits with
interest plus monthly benefits thereafter.  (*See id.*).  Northwestern examines Kafie's various
arguments in favor of his claim of bad-faith treatment, and concludes that none of
Northwestern's alleged conduct has been shown to have proximately caused a loss of unaccrued
future benefits.  (*See id.* 16–17).  According to Northwestern, Kafie "has offered no evidence . . .
supporting the proposition that receipt of the [February 3, 2009] letter or the Company's 'hostile
and rude' conduct proximately caused him any compensable damages."  (*Id.* 16).

  Kafie states in response, "[i]t is, of course, reasonably foreseeable that a disability

insurer's bad faith conduct will impair its insured's right to future benefits." (Resp. 8). He contends that when an insurer violates its duty to be fair and reasonable, the disabled policyholder cannot expect fair and reasonable treatment in the future as he supposed when he purchased his policy. (*See id*.). Kafie notes that even now, Northwestern believes it "made the appropriate decision" in terminating his benefits. (*Id*. 9 (quoting Hyde Dep. 182:22–183:4; 184:8–11)).

As a general rule, foreseeability as it relates to proximate causation is a question of fact. *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992). The court in *McCain* explained,

> harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question. In other words, human experience teaches that the same harm can be expected to recur if the same act or omission is repeated in a similar context.

*Id*. at 503. "The judge is free to take this matter from the fact-finder only where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference." *Id*. at 504.

The contention that Northwestern's alleged bad faith leads to the reasonably foreseeable result of endangering Kafie's receipt of future benefits may or may not be a weak one. It strikes the Court as questionable, given that the parties do not dispute Northwestern has fulfilled the judgment of *Kafie I* to date and paid Kafie's benefits as envisioned under the Policies. (*See* SMF ¶ B.3.). That the Court finds Kafie's position weak, however, is not a basis to grant summary judgment. It is not for the Court to decide in place of the fact-finder, and Kafie is indeed fortunate that the undersigned will not serve the role of fact-finder here. The Court declines to

Case No. 11-21251-CIV-ALTONAGA/Simonton

grant summary judgment on the basis of proximate causation.

### D.       Whether Kafie may recover damages for the loss of a rental home

Northwestern contends Kafie incorrectly alleged an inability to make mortgage payments and the loss of his home in the Amended Complaint, a point Kafie acknowledges was an error. (*See* Mot. 18 (citing Am. Compl. ¶ 27; Kafie Dep. 71:5–11); Resp. 14).  Kafie clarifies that he does not seek damages arising from an inability to make mortgage payments, rather he seeks damages from an inability to pay rent and the eventual loss of his home.  (*See* Resp. 14). Northwestern asserts Kafie suffered no damages thereby because he admitted to receiving interest-free loans from his family to help pay the rent, which he chose not to pay back once he received his disability benefits.  (*See* Mot. 18 (citing Kafie Dep. 60:12–61:24; 109:7–110:21)). Northwestern further argues Kafie did not timely and sufficiently allege this item of special damages.  (*See* Mot. 18 (quoting FED. R. CIV. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated."))).

The Court need not address the standard for pleading special damages here, because even if Kafie were found to satisfy Rule 9(g), it is undisputed Kafie made his rental payments and did not lose his rental home.  (*See* Kafie Dep. 61:8–10 ("Q: Did you make all the payments on that lease to fulfill your obligations?  A: We did.")).  It is also undisputed Northwestern fulfilled the judgment of *Kafie I* and therefore made Kafie whole, particularly since the loans he took to pay his rent were interest-free.  What he later did with the judgment money, or did not do with it, is not a damage related to his rental home.  The Court therefore grants Northwestern's motion for summary judgment as to this item of alleged damage.

19

Case No. 11-21251-CIV-ALTONAGA/Simonton

###### E.      Whether Kafie presents evidence of other damages

Northwestern seeks summary judgment on Kafie's allegations of "expenses incurred . . . and interest from expenses incurred on interest-bearing accounts," costs of renting storage space, and the sale of a dining-room set for less than its worth.  (Mot. 19–20 (quoting Pl.'s Answers to Def.'s Interrogs. ¶ 3 [ECF No. 65-9])).   Northwestern again asserts Kafie fails to meet the pleading standard of Rule 9(g).  (*See id.* 20).

Northwestern is correct that special damages must be specifically pleaded pursuant to Rule 9(g).  This would appear to be particularly true given the nature of the statutory bad-faith claim.  One of the primary rationales of this cause of action is to allow an insured to recover damages *not* covered by his policy.  *See Talat Enters., Inc. v. Aetna Cas. & Surety Co.*, 753 So. 2d 1278, 1281 (Fla. 2000).  In fact, the insurer's motivation in settling an insured's claim within the "cure period" after a CRN is filed is to avoid the uncertainty and potential costliness of *non*-contractual damages.  *Id.* at 1281.   An insurer facing a bad-faith claim must, by definition, therefore respond to allegations of damage that it has no notice of by contract.  It stands to reason that the claimant must give some minimum notice to the insurer of what his damages are to allow the insurer to respond.  *See* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1311 (3d ed. 2004) (noting that allegations of special damage should "enable the opposing party to prepare his or her responsive pleading and a defense to the claim.")).

The court in *Leavitt v. Cole*, 291 F. Supp. 2d 1338 (M.D. Fla. 2003), emphasized that Rule 9(g) has been "perhaps the best means of ensuring that an unwitting defendant not be blindsided by claims for certain types of damages not explicitly pled," but that the requirement in

Rule 26(a)(1)(C) on initial disclosures, including for damages, has nullified the purpose of Rule 9(g) somewhat. 291 F. Supp. 2d at 1344 n.6. The Court therefore takes into account not only allegations of damages in the pleadings, but also Kafie's initial disclosures.

In the Amended Complaint, Kafie alleges the following with respect to damages, in relevant part: "[a]s a result of [Northwestern's] decision, Kafie was left without any income to support his family . . . , and had his vehicle repossessed." (Am. Compl. ¶ 27). He states that "[a]s a direct, foreseeable, and proximate result of [Northwestern's] bad faith, Kafie has suffered and continues to suffer damages in excess of $75,000," and he demands the "present value of future benefits due under the policies, punitive damages, attorneys' fees, costs, pre-judgment interest . . . ." (*Id.* ¶ 57).

In response to an interrogatory about his damages, Kafie responded that the request was "premature," discovery was ongoing, and he could not calculate each item claimed. (Pl.'s Answers to Def.'s Interrogs. ¶ 3 [ECF No. 65-9]). Kafie specified that he sought:

> 1.     Damages resulting from Defendant's wrongful termination of benefits, including but not limited to: expenses incurred, financial assistance received, and interest from expenses incurred on interest-bearing accounts.
>
> 2.     Punitive damages, which must be assessed by a jury;
>
> 3.     Prejudgment interest, and
>
> 4.     Attorneys' fees and costs pursuant to Fla. Stat. § 624.155.
>
> Kafie will supplement this response as additional information becomes available.

(*Id.*). Northwestern argues Kafie had ample time to conduct discovery for evidence to support his alleged damages; yet Kafie has not produced evidence regarding "expenses incurred . . . and

Case No. 11-21251-CIV-ALTONAGA/Simonton

interest from expenses incurred on interest-bearing accounts." (Mot. 19 (quoting Pl.'s Answers to Def.'s Interrogs. ¶ 3)). Moreover, although Kafie mentioned at his deposition that he sold a dining room set for less than its worth, and incurred storage costs (*see* Kafie Dep. 64:16–66:1), he did not include this allegation in the Amended Complaint. (*See* Mot. 20).

With respect to the dining-room set and storage costs, Kafie gave notice of "expenses incurred" in his answers to Northwestern's interrogatories. (Pl.'s Answers to Def.'s Interrogs. ¶ 3). In his deposition, Kafie described the dining-room set and its value, and the amount of storage paid during the relevant period. (*See* Kafie Dep. 64:18–22; 65:16–66:1). Although Kafie would have been well-advised to specify these damages earlier, under the circumstances the Court finds Northwestern was given sufficient notice of these damages in the normal course of discovery. The Court declines to grant summary judgment on these items of damage.

With respect to the interest paid on accounts, Kafie testified at his deposition that when he received money from the *Kafie I* judgment, he used it to pay $17,000 or $18,000 in credit-card bills, plus a promissory note of $7,500. (*See* Kafie Dep. 64:4–9). In fact, he says he paid off "close to $30,000 in debts." (*Id.* 64:10–11). The credit-card debt, at the very least, likely bore interest; the other debts may have as well. Summary judgment on this item of damage is therefore denied.

### F.     Whether Northwestern's litigation conduct is actionable

Northwestern asserts Kafie seeks to hold it liable for bad faith not only for its initial handling of his claim, but also based on its conduct during *Kafie I* and after. (*See* Mot. 20 (citing Am. Compl. ¶¶ 29–36; 39–41)). According to Northwestern, the litigation in *Kafie I* could not have been included in the Civil Remedy Notice ("CRN") Kafie filed as the basis for his claim in

22

Case No. 11-21251-CIV-ALTONAGA/Simonton

that lawsuit, because the litigation occurred after the CRN was filed.  (*See id*.).  Moreover, Northwestern asserts it is entitled to the "absolute immunity" afforded to acts occurring during the course of a judicial proceeding.  (*Id*. (quoting *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994))).  Kafie responds that it is well-settled that an insurer's conduct in coverage litigation is relevant, discoverable, and admissible in a subsequent bad-faith action under section 624.155.  (*See* Resp. 16).

The parties identify a seeming tension in the law between differing pronouncements of the courts.  In *Allstate Indemnity Co. v. Ruiz*, 899 So. 2d 1121 (Fla. 2005), that court explained, "[g]enerally, an insurer's claim and litigation files constitute work-product and are protected from production.  The analysis differs however when an insurance company is sued for bad faith." *Id.* at 1123.  As the court stated, the evidence relevant to a bad faith claim is "whether an insurance company has processed, analyzed, *or litigated* a claim in a fair, forthright, and good faith manner."  *Id*. at 1124 (emphasis added).  Thus, in the discovery context, the court held that for both statutory and common law bad-faith actions, the insurer's "underlying claim file type material" is discoverable over work-product privilege objections, "*up to and including the date of judgment* in the original litigation."  *Id*. at 1126 (emphasis added).  The decision in *Allstate* involved a thoughtful and reasoned reversal of an earlier Florida Supreme Court decision in part. The facts in *Allstate*, however, involved a discovery dispute over purported privileged work-product, not the litigation privilege *per se*.

Kafie also points to a decision in which the Eleventh Circuit held, "[c]ertainly the *litigation conduct of [the insurer] was relevant* to the claim that [it] or those acting on its behalf dealt dishonestly with [the insured].  Although this conduct occurred after the denial of [the

23

Case No. 11-21251-CIV-ALTONAGA/Simonton

insured's] claim, it did corroborate [the insured's] contention that [the insurer] deliberately deceived it while [the insurer] was investigating the fire." *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1527 (11th Cir. 1985) (emphasis added). At issue was the insurer's decision to raise a defense of arson at the trial level. *See id.* The issue of the litigation privilege did not arise in *T.D.S.* because the plaintiff had been able to bring his claim for bad faith simultaneously with his claim for coverage. *See id.* at 1526 (noting that trial court would not grant separate trials for count seeking payments under policy, and count for punitive damages for insurer's tortious conduct, including alleged bad faith). Thus, the issue in *T.D.S.* was merely whether the insurer's litigation conduct was relevant to the bad-faith claim, which the Eleventh Circuit held clearly was the case.

Two years after *Allstate*, however, the Florida Supreme Court resolved a disagreement among lower courts on the litigation privilege, holding "[t]he litigation privilege applies across the board to actions in Florida, both to common-law causes of action, those initiated pursuant to a statute, or of some other origin." *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 384 (Fla. 2007). "It is the perceived necessity for candid and unrestrained communications in those proceedings, free of the threat of legal actions predicated upon those communications, that is at the heart of the rule. The nature of the underlying dispute simply does not matter." *Id.*

Such a clear pronouncement would seem to settle the matter, were it not for the fact that the reasoning in *Allstate* and *T.D.S.* are more reflective of the particular considerations involved in the statutory bad-faith action. The decision in *T.D.S.* would seem to reflect the state of affairs

24

when an insured did not have the statutory remedy available to him.[3]  Thus, for example, the

insured in *T.D.S.* had to prove "more than generalized 'bad faith'" to recover punitive damages

for the insurer's allegedly tortious, fraudulent conduct.  *T.D.S.*, 760 F.2d at 1527.  The legislature

passed section 624.155 in order to expand the insured's remedies, such that he could bring a

first-party action even if the insurer's alleged conduct fell short of an independent tort such as

fraud, provided that the insured complied with the steps specified in the statute.  *See Talat*, 753

So. 2d at 1281, 1283–84.  It therefore seems inconsistent with the purpose of section 624.155 to

hold that where insureds were able to present evidence of an insured's litigation conduct as

relevant to a bad-faith claim *before* the statutory remedy was passed, insureds were no longer

able to do so afterward due to the attachment of the litigation privilege.

This is particularly true given *Dadeland Depot, Inc. v. St. Paul Fire & Marine Insurance

Co.*, 483 F.3d 1265 (11th Cir. 2007), an Eleventh Circuit decision setting forth the answers to

questions about section 624.155 certified to the Florida Supreme Court.  In *Dadeland*, the court

explained that the Florida Supreme Court had concluded an insurer was collaterally estopped

from raising the same affirmative defenses in a bad-faith action that had been raised and

considered in the original coverage dispute.  483 F.3d at 1279.  However, the Florida Supreme

Court held the insurer "was *not* precluded from demonstrating the *factual basis* for its belief that

the defenses it raised in the [original] arbitration proceeding were valid."  *Id.* (emphasis in

original).  The Florida Supreme Court had found:

> [the insurer] could seek to defend against the current bad faith
> claim by arguing that it reasonably and in good faith believed that
> the previously rejected affirmative defenses were valid at the time

---

[3]  The insured in *T.D.S.* commenced suit in state court in 1980, *see* 760 F.2d at 1526, or two years before
the Florida Legislature adopted section 624.155.  *See Talat*, 753 So. 2d at 1281.

Case No. 11-21251-CIV-ALTONAGA/Simonton

> it raised them in the arbitration, and that the factual basis for that belief, if reasonable, could feasibly assist [the insurer] in defending against [the insured's] current § 624.155(1)(b)(1) action.

*Id.* (quotations and internal citations omitted). In other words, the insurer could defend a bad-faith claim by putting into issue the factual basis for its litigation decisions. *See id.* Because a court adjudicating a statutory bad-faith claim must "consider the entirety of the factual scenario underlying the plaintiff's claim . . . this factual scenario would *necessarily* include a review of whether [the insurer] reasonably believed that its affirmative defenses were valid, thereby excusing it from performing its obligations under the performance bond." *Id.* n.12 (emphasis added). This strongly suggests the litigation privilege should not attach to the initial dispute serving as the condition precedent to a bad-faith action, as the insurer's handling of the claim, including its defense at trial, would seem to be at the very heart of the bad-faith action.

The Court therefore finds Northwestern's litigation conduct in *Kafie I* relevant to Kafie's claim and actionable. That the litigation occurred after the relevant CRN was filed is of no moment. The litigation itself is not the basis for the claim identified in the CRN, but is merely potentially relevant to the bad faith claim, which *is* sufficiently identified.

### G.   Whether immaterial allegations must be stricken

Northwestern argues that immaterial allegations in the Amended Complaint should be stricken, per the Court's September 27, 2011 Order, and the Motion. (*See* Mot. 21). The Court deems this unnecessary, as the September 27, 2011 Order and the present Order sufficiently identify which portions of the Amended Complaint remain.

### IV.   CONCLUSION

For the foregoing reasons, it is

26

Case No. 11-21251-CIV-ALTONAGA/Simonton

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 65]** is **GRANTED in part and DENIED in part**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 2nd day of December, 2011.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

27